Clifford A. **CARTER** and Herbert J. Brough, Plaintiffs,

v.

**SIGNODE INDUSTRIES, INC., a Delaware corporation; Signode Corporation, Inc., a Delaware corporation; Signode Employees' Savings Profit Sharing Plan; Stifel Nicolaus & Co., a Missouri corporation; J. Thomas Schanck; Roger H. Cushman; William W. Tongue; Richard M. Burridge; H. Robert Powell and Robert T. Callahan, Defendants.**

No. 87C9939.

United States District Court, N.D. Illinois, E.D.

June 27, 1988.

**1284**

Charles Pressman, Joel M. Hellman, Bertrand A. Rice, Charles Pressman, P.C., Chicago, Ill., for plaintiffs.

John J. Cassidy, Jr., Vedder Price Kaufman & Kammholz, James A. Christman, Wildman Harrold Allen & Dixon, Chicago, Ill., Thomas E. Douglass, Ellen E. Bonacorsi, Coburn Croft & Putzell, St. Louis, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs Clifford Carter and Herbert Brough, former employees of Signode Industries, Inc., filed this four-count class action against Signode Industries, its successor Signode Corporation (hereafter, collectively "Signode"), the Signode Employees' Savings & Profit Sharing Plan ("the Plan"), the other individual trustees and fiduciaries of the Plan and the financial services firm of Stifel Nicolaus & Co. ("Stifel Nicolaus") charging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b–5. Defendants move to dismiss all counts.[1] We now consider defendants' motion for summary judgment as to the ERISA counts, and for the following reasons, we deny the motion.

### Factual Background[2]

Carter and Brough were employees of Signode for over 30 years until they retired in 1986. Both participated in an employees' savings plan ("the Plan") which combined employer and employee contributions in a general investment fund. The Plan trust terms allow participants to select one of several distribution options upon termination of employment. All such options involve a valuation of Plan assets within 30 days of termination. At all times relevant to this action, the Plan held assets worth about $150,000,000, a substantial part of which consisted of 1,050,000 shares of Signode Industries common stock.

On August 8, 1986, Signode Industries merged with Illinois Tool Works ("ITW") in a transaction through which ITW purchased the common stock of Signode Industries at $28.726 per share. This merger produced Signode Corporation, the surviving firm. The management of Signode Industries had begun to consider restructuring the firm at least as early as the end of 1985. On or about January 27, 1986, the Signode Board of Directors (chaired by defendant J. Thomas Schanck) formed a planning committee to explore reorganization possibilities. In May of 1986, Signode Industries hired Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") as financial advisor, and Merrill Lynch valued the Signode common at between $18 and $27 per share in a report to Signode management dated May 23, 1986.

On or by June 6, 1986, Signode management indicated to the planning committee that it was considering buying up Signode common for $25 a share. On July 8, 1986, Merrill Lynch revised its estimates of share value to reflect that figure as a minimum. Defendants never advised plaintiffs or any

---

**1.** Defendants ask that we treat their motion to dismiss as a motion for summary judgment. As evidenced by their submission of a statement of contested facts pursuant to Local Rule 12(f), it is clear that plaintiffs have had an opportunity to present evidence in opposition to summary judgment. *See* Fed.R.Civ.P. 12(c). *Beam v. Ipco*

*Corp.*, 838 F.2d 242 (7th Cir.1988). We, therefore, convert the motion as to the ERISA counts to one for summary judgment.

**2.** The following facts are distilled from the complaint and from evidence presented in the motion to dismiss and memorandum in opposition.

other members of the putative class of the restructuring plans or of the stock valuations.

Despite the sale of Signode common for $28.726 per share on August 8, 1986, Signode common was valued by the Plan at between $3.50 and $6.50 per share for purposes of Plan participations and distributions between January 1 and August 8 of 1986. These figures came from a series of appraisals of Signode common made in the first half of 1986 by defendant Stifel Nicolaus.

In the aftermath of the Signode/ITW merger, several former employees in the putative class complained about the undervaluation of Signode stock for Plan distributions. In November 1986, plaintiff Carter learned the merger price for the Signode common and telephoned defendant Robert Callahan, the Director of the Plan. Carter claims that he told Callahan he "had been taken to the cleaners," and that Callahan said that it was a shame but implied that nothing could be done about the valuation.

Carter wrote to Callahan on November 11, 1986, to obtain written confirmation of the appraisal data used to compute his Plan account values. Callahan's reply recounted the Signode common stock valuation figures over the course of 1986 but made no explanation of the sudden rise in stock price. Also, the reply made no mention of any procedure by which Carter could request review of the valuation or make any further appeal to the Plan fiduciaries.

On October 3, 1986, Steven Huff, another former Signode employee, wrote to ask Callahan about the discrepancy between the Plan valuation of Signode common from May 1986 and the merger price three months later. On November 20, 1986, the General Counsel and Vice President of Signode, J.R. Welton, replied by letter stating that Huff's pension distribution was based on a May 16, 1986 appraisal of Signode common at $5.61 per share. On March 13, 1987, Huff again complained to Callahan that his Plan account had been grossly undervalued and requested that the distribution be adjusted. After receiving an un-

responsive letter from Callahan, Huff made the same request again on April 9, 1987.

Callahan then sent Huff's letter to General Counsel Welton. In a cover memorandum to Welton, Callahan wrote:

> Dick, attached is another communication from Steve Huff. Is there something strong we can say to either make him "show his hand" or shut up?

Welton drafted a response to Huff for Callahan, which stated that, since Huff's account, like all others, was valued solely in accordance with an independent appraisal of Signode common before the ITW merger, "... it would not be appropriate to make any adjustment on a retroactive basis." Also, on the draft sheet of the reply, Welton wrote the following note to Callahan:

> Bob—This is the *last* time I suggest you respond—regardless of his persistence!
> Dick

Another retiree and member of the putative class, John Seagrist, requested in writing on June 26, 1987, that the Plan review his pension distribution. Like Huff and Carter, Seagrist complained about the disparity between Signode common appraisals before and during the ITW merger. According to Callahan, two of his fellow members of the four-man Plan administrative committee were made aware of Seagrist's complaint. Seagrist received a reply identical to that sent to Huff several months earlier; there were no plans to make retroactive adjustments of the pensions.

### Procedural History

Plaintiffs allege generally in their Second Amended Complaint that defendants wrongfully deprived them and other similarly-situated retirees of Signode of a substantial portion of their pension benefits. Specifically, when plaintiffs retired in mid–1986, Signode was planning to merge or restructure in some way and, in connection with these plans, some of the defendants received appraisals of the real value of Signode common far higher than the figure the Plan used to determine pension distributions. Plaintiffs also claim that they and the other asserted class members were not

informed of the restructuring plans and appraisals of Signode common before giving up their accounts in the Plan investment fund, and that the Plan thereby undervalued Signode common stock and made grossly insufficient distributions to the retirees.

Three of the counts are brought under ERISA on behalf of a class of all persons who retired from Signode and received pension valuations between January 1, 1986 and August 8, 1986. In Count I, plaintiffs charge the Plan with failure to comply with Section 503 of ERISA, 29 U.S.C. § 1133, which requires adequate and meaningful internal relief mechanisms for all ERISA plans and with the improper valuation of the fair market price of Signode common stock. In Count II, plaintiffs charge Signode and six Plan trustees with breaches of fiduciary duties in violation of Sections 404 and 405, 29 U.S.C. §§ 1104, 1105. Finally, in Count IV, Plaintiffs seek damages from Signode and Schanck or, alternatively, Stifel Nicolaus under Section 502(a)(3), 29 U.S.C. § 1132(a)(3). In Count III, the plaintiffs bring a securities claim on behalf of a subclass of retirees who surrendered their interests in the Plan investment fund in exchange for guaranteed income contracts.

On February 29, 1988, the defendants moved to dismiss Counts I, II and IV for failure to exhaust administrative remedies and to dismiss Count III for failure to state a claim. Previously on December 22, 1987, we ordered all discovery stayed that was not related to the ERISA administrative exhaustion issue; hence, there has been no discovery taken on the merits or on class issues. On May 2, 1988, we continued the limited discovery stay and decided to defer ruling on the motion to dismiss Count III pending resolution of the petition for class certification.[3] We further deferred briefing on the petition for class certification pending our resolution of the motion to dismiss the ERISA counts. We now deny the motion to dismiss the ERISA counts.

## Exhaustion of Administrative Remedies Under ERISA

■ Generally, a plan participant or beneficiary must exhaust all administrative remedies available under an ERISA Plan before challenging in court a decision to deny benefits. Application of this exhaustion doctrine is, however, "committed to the sound discretion of the district court." *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 466 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). *See also Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238, 1244–45 (7th Cir.1983); *Janowski v. Local No. 710 Pension Fund,* 673 F.2d 931 (7th Cir.1982), *vacated on other grounds,* 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983). In exercising this discretion, the court may relieve the plaintiff of the exhaustion requirement if resort to the Plan procedures would be futile, *Dale,* 797 F.2d at 466, or the Plan administrators deny the claimant meaningful access to the procedures. *Boesl v. Suburban Trust and Savings Bank,* 642 F.Supp. 1503, 1516 (N.D.Ill.1986). We find on the undisputed facts that plaintiffs have demonstrated that exhaustion is excused under both the futility and denial of access exceptions, and, accordingly, defendants are not entitled to a judgment that plaintiffs' ERISA claims are precluded for failure to exhaust administrative remedies.

### A. The Futility Exception

■ The Plan sets forth only in general terms the administrative procedures by which a Plan participant may obtain review of a benefits denial or miscalculation:

(a) Any participant ... who believes that he is then entitled to receive a benefit under the Plan, including one greater than that initially determined by the Committee, may file a claim in writing with the Committee.

The Plan Guide states:

If you have reason to feel you have not been paid the proper amount, you may

---

3. Dismissal of Count III for failure to state a claim would be a ruling on the merits, and, therefore, there must be a class determination under Fed.R.Civ.Pro. 23(c)(1). *See Bieneman v. City of Chicago,* 838 F.2d 962, 963–64 (7th Cir. Feb. 1988). However, defendants' motion to dismiss Counts I, II and IV for failure to exhaust administrative remedies, if granted, would not be on the merits and would not bar reassertion of the claim at a later date.

request a review of the settlement by filing a claim in writing within four months of the time the decision was made.

Neither reference identifies precisely the method by which a claimant should correspond with the Committee. Further, no specified forms for making claims existed under the Plan.

We agree with defendants that neither Carter nor Brough made claims to the Plan Committee. In the absence of any identified recipient of claims, Carter addressed his request for clarification in a letter to the logical person of choice—Callahan, the Director of the Plan. However, Carter did not request review of his pension distribution or an adjustment of the benefits. At most, Carter articulated his concern by requesting detailed information regarding the calculation of his distribution. Brough, on the other hand, never corresponded with the Committee, or Callahan specifically, regarding his benefits.

Their failure to make claims, however, is not fatal to their ERISA causes of action, for any efforts on their part to seek review of their savings plan benefits award would have been futile. Our decision hinges on the treatment that the Committee, through Callahan, gave to the claims submitted by Huff and Seagrist, two retirees and putative class members. Huff and Seagrist communicated with Callahan and expressly sought review and adjustment of their pension distributions on account of the apparent inconsistencies in Signode stock appraisals. As with Carter's correspondence, that Huff and Seagrist directed their requests to the Plan Director rather than the Committee is of no consequence, for clearly their correspondence with Callahan was "reasonably calculated to bring the claim to the attention of [the employer]." 29 C.F.R. § 2560.503–1(d).[4] Callahan is director of the pension fund and, by his own admis-

sion, was the only person who could determine whether to submit a complaint to the administrative committee.

In responding to Huff's and Seagrist's requests, Callahan made it clear that no adjustments were forthcoming. Further, Callahan in no way suggested that their requests did not constitute formal claims to the Plan Committee or that further avenues of relief were available. Indeed, Callahan admits that other members of the Committee were aware of Seagrist's complaint. Finally, as the only person who could determine whether to submit a claim, for all practical purposes, his denial constituted a final decision.

With this information, it is clear that any similar efforts by Carter and Brough would have been fruitless. Any request for review or adjustment, whether addressed to Callahan or "the Committee," would most likely have met the same fate of rejection. It is especially instructive that Callahan and General Counsel Welton expressed their intention to ignore and stifle any further attempts by Huff and Seagrist to seek reappraisal of Signode stock and an adjustment of pension benefits. Defendants have presented no evidence that suggests that claims by Carter and Brough might have been treated differently.

The Meaningful Access Exception

■ Plaintiffs contend alternatively that Callahan's failure to submit Carter's and putative class member Huff's claims to the administrative committee denied them meaningful access to review procedures. Generally, claimants are not required to exhaust administrative remedies when the conduct of the administrator amounts to a repudiation of the procedures, such as when an administrator neglects to submit claims to the proper reviewing body. *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903,

---

**4.** On this basis, the decisions upon which defendants rely are distinguished. In *Mason v. Continental Group, Inc.*, 763 F.2d 1219 (11th Cir.1985), *cert. denied*, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986), the pension plan procedure included submission of grievances to impartial third-party arbitration, and the claimant's failure to comply with this unambiguous

requirement warranted dismissal. Here, the Signode Plan contains no such provision and, more significantly, lacks any specificity. Similarly, the Plan in *Bowler Contract Hauling, Inc. v. Central States Pension Fund*, 547 F.Supp. 783 (S.D.Ill.1982), offered, unlike here, a highly detailed administrative review process including evidentiary hearing and right of representation.

914, 17 L.Ed.2d 842 (1967) (discussing the exhaustion requirement as applied to causes of action under the Labor Management Relations Act). In the context of ERISA as well, the meaningful access exception arises "... where, first, one party has the sole power to invoke the higher levels of the review procedure and has not allowed another party access. Second, the other party must have made attempts to have the higher levels of review initiated." *Lucas v. Warner & Swasey Co.*, 475 F.Supp. 1071 (E.D.Penn.1979).

The undisputed facts suggest that Seagrist and Huff, and therefore presumably Carter and Brough, were denied meaningful access to Plan procedures for the review of a benefits denial. Callahan had sole authority to have the Committee consider claimants' requests for review and adjustment and continually refused to act on the requests. That Seagrist and Huff did not directly ask Callahan to submit their claims to full committee review does not render the exception inapplicable, for Callahan was the Plan Director and a member of the Committee, and, in the case of Seagrist, other members were aware of the request and did not voice any objection to Callahan's response.

Defendants rely on *Lucas v. Warner & Swasey Co.* to support their argument that plaintiffs' claims must first have been submitted to the administrative committee. *Lucas* is reasonably distinguished from this case. There, the plaintiff submitted his claim for benefits to the employer rather than to the plan fiduciary designated to handle such claims. 475 F.Supp. 1071, 1075. It is clear from the evidence before us that Callahan, as Director of the Plan fund and a Plan fiduciary, was the correct, or at least a reasonable, target of any claimants' correspondence. Accordingly, Callahan denied claimants meaningful access to the administrative review procedures.

### Conclusion

Defendants have failed to demonstrate on the undisputed facts that plaintiffs' failure to exhaust administrative remedies precludes filing claims under ERISA, and, accordingly, defendants' motion for summary judgment as to Counts I, II and IV is denied. We lift the general stay of discovery on issues not relating to ERISA exhaustion and order the plaintiffs to file their motion for class certification within fifteen days. Defendants are to respond ten days thereafter. Plaintiffs' reply is due ten days later. Status hearing is reset for August 26, 1988, at 10:00 a.m. It is so ordered.