**Ethelene SPRINGER, Plaintiff,**

v.

**WAL–MART ASSOCIATES' GROUP HEALTH PLAN, Defendant.**

**Civ. A. No. 88–AR–5226–NW.**

United States District Court,
N.D. Alabama,
Northwestern Division.

June 6, 1989.

Dennis N. Odem, Florence, Ala., for plaintiff.

Barry V. Frederick, Powell Tally & Frederick, Birmingham, Ala., for Health and Welfare Trust.

## MEMORANDUM OPINION

ACKER, District Judge.

The above-entitled action was brought by Ethelene Springer against Wal–Mart Associates' Group Health Plan (the Plan) under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* It was tried by the court with an advisory jury whose findings are, of course, not binding on the court. Through the pre-trial conference, defendant was called "Wal–Mart Stores, Inc. Health and Welfare Trust", but the parties have now agreed that the correct name of defendant Plan is "Wal–Mart Associates' Group Health Plan."

*Certain Non–Issues*

The court granted defendant's motion to strike plaintiff's jury demand, following *Whitt v. Goodyear Tire & Rubber Co.,* 676 F.Supp. 1119 (N.D.Ala.1987), although this court predicts that if and when the issue reaches the Supreme Court, the Supreme Court will follow the reasoning it employed in *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), and will recognize the Seventh Amendment's guarantee of trial by jury in ERISA cases except as to issues purely equitable in nature, inasmuch as Congress chose not expressly to preclude jury trial in ERISA. *See Cox v. Keystone Carbon Co.,* 861 F.2d 390 (3d Cir.1988); *Berlo v. McCoy,* 710 F.Supp. 873 (D.N.H.1989). There is now a perceptible, if slow, retreat from the doctrinaire denial of jury trials in all ERISA cases without regard to their the subject matter or the remedy sought.

Even after *Firestone Tire & Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Plan here continued to insist on the standard of review being whether or not it had been "arbitrary and capricious" in not paying Springer's claim. This court reads *Bruch* differently and will judge this action as it would any action for breach of contract or for breach of fiduciary obligation.

With *Amos v. Blue Cross–Blue Shield of Alabama,* 868 F.2d 430 (11th

Cir.1989), still ringing in its ears, this court has already acknowledged in a previous order entered in this case that ERISA preempts Springer's pendent state claim based on the Plan's alleged bad faith refusal to pay her medical benefits. Nonetheless, this court would welcome a Congressional or a Supreme Court reconciliation on the important, confusing and depressing subject of preemption, especially in view of the fact that the Sixth Circuit, on April 10, 1989, went in what this court believes is a desirable different direction in *Perry v. P\*I\*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir.1989). The Sixth Circuit there holds, as this court erroneously did in *Amos v. Blue Cross–Blue Shield of Alabama*, 676 F.Supp. 1119 (Ala.1988), *rev'd*, 868 F.2d 430 (11th Cir.1989), that preemption should apply to state law claims only if Congress has provided in ERISA a remedy for any historically legally recognized wrongs asserted. Further, Congress itself, speaking through the House Education and Labor Committee, has overtly quarreled with the prevailing reading of *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), by saying:

> The Committee believes that the legislative history of ERISA and subsequent expansions of ERISA support the view that *Congress intended for the courts to develop a Federal common law with respect to employee benefits plans*, including the development of appropriate remedies, even if they are not specifically enumerated in Section 502 of ERISA. Since the issue of preemption in civil remedies under ERISA is within the exclusive purview of the labor committees of Congress, the Committee has, over the years, considered the option of amending the statute to encompass specifically several additional remedies. *In light of the legislative history on this issue, however, the Committee believes such action is unnecessary. The Committee reaffirms the authority of the Federal courts to shape legal and equitable remedies to fit the facts and circumstances of the cases before them, even though those remedies may not be specifically mentioned in ERISA itself.* In

cases in which, for instance, facts and circumstances show that the processing of legitimate benefit claims has been unreasonably delayed or totally disregarded by an insurer, an employee, a plan administrator, or a plan, *the Committee intends the Federal courts to develop a Federal common law of remedies, including (but certainly not limited to) the imposition of punitive damages on the person responsible for the failure to pay claims in a timely manner.*

H.R.Rep. No. 801, 100th Cong., 2d Sess., Pt. 2, at 63 (1988) (emphasis supplied).

This expression of legislative intent can hardly be misunderstood. The same lament is found in Fischel & Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U.Chi.L. Rev. 1105 (1988), where Fischel and Langbein, on the very first page of their article, say:

> The overbroad preemption provision has wreaked aimless interference upon state regulation of areas such as health insurance that are quite peripheral to pension policy. Neither a substantial string of Supreme Court cases nor occasional Congressional repair has been able to cure the mess.

*Id.* at 1105–06 (footnotes omitted).

To the same effect is Irish & Cohen, *ERISA Preemption: Judicial Flexibility and Statutory Rigidity*, 19 Mich. J. of L. & Reform 109 (1985), where these two critics say:

> For courts to determine not only that state laws have been preempted but also how and whether to fill in gaps created by preemption, they must develop a common, coherent understanding of *why* state laws have been preempted. Were the basis for ERISA preemption similar to the broad principles of federalism set out by Justice Frankfurter in the [*San Diego Bldg. Trades Council v.*] *Garmon* case [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed. 2d 775 (1959) ] then it would be clear that state laws, even if preempted, remain an important source of policy in crafting federal common law to fill the void. If preemption were limited to the subject

matters ERISA covers, then it would be reasonable to infer that state laws should be respected only where Congress remains silent in ERISA. When all state laws that have any relation to employee benefits plans are preempted willy nilly, however, regardless of whether their purpose and subject matter are complementary to ERISA, it is hard for courts to craft a reasoned basis on which to revivify appropriate and compatible state policies through the creation of a federal common law of benefit plans. The problem with section 514(a), succinctly stated, is that it drains the preemption doctrine of both rationale and flexibility, implying that any law from a non-federal source is simply not relevant to benefit plans.

*Id.* at 157 (emphasis in original).

This court further notes a very recent decision by the Ninth Circuit, which, in this court's view, correctly implements Congressional intent by holding that the liquidated damage provision of ERISA does not preempt alternative contractual remedies formerly available under federal common law. *Idaho Plumbers & Pipefitters Health & Welfare Fund v. United Mechanical Contractors, Inc.*, 875 F.2d 212 (9th Cir.1989). *See also Graves v. Blue Cross of Cal.*, 688 F.Supp. 1405, 1413 (N.D. Cal.1988) (ERISA does not preempt claims brought pursuant to California Insurance Code). The Supreme Court itself has very recently punched another hole in the ERISA plan administrator's armour of preemption. Adding a dimension to *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Court in *Massachusetts v. Morash*, —— U.S. ——, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), found that a Massachusetts criminal action for an employer's failing to pay vacation pay was not preempted by ERISA, even though it was clearly the policy of the employer to pay discharged employees for their unused vacation time and in some sense was therefore part of an "employee benefit plan." The erosion of total preemption continues apace.

In Springer's case, this issue of the alleged preemption of her state claim for bad faith refusal to pay becomes academic be-cause it would have been difficult, if not impossible, for Springer to meet the burden of proving the essential elements of such a claim under Alabama tort law. The Plan's refusal to pay was incorrect, but the issue was legitimately debatable, particularly as to timing and amount.

The non-issues now having been removed from the case, it becomes appropriate for the court to make findings of pertinent fact. Most of the material facts were stipulated to by the parties. Except where the court finds the parties' stipulation to be ambiguous or incomplete, the stipulation will be adopted. The parties did not attempt to stipulate as to some facts which this court finds pertinent. These facts must be determined by a sifting of the evidence and an assessing of credibility.

### Findings of Pertinent Fact

Springer was an employee of Wal–Mart Stores, Inc. As such, she was a participant in the Plan sponsored by Wal–Mart for the purpose of providing its employees and their families with health benefits.

On November 7, 1987, Springer, her husband and her minor daughter were seriously injured in an automobile accident entirely caused by a drunken driver, Jerry Leon Thigpen, who was subsequently charged and convicted of driving under the influence of alcohol. Thigpen at that time was uninsured and was, and is, penniless. On the witness stand, he gave the appearance of being an alcoholic derelict.

The Springers' vehicle was insured by State Farm Insurance Company. The insurance policy included both "medical pay" of $5,000.00 per person injured in the insured vehicle and uninsured motorist coverage of $200,000.00 or more. The Springers sued both Thigpen and State Farm, claiming the items of damage usually set forth in such a complaint filed in Alabama, i.e., medical expenses, pain and suffering (past and future), lost wages (past and future), and punitive damages. The Springers thereafter entered into a consent judgment with Thigpen, in which each of the three Springers was awarded a judgment in the

sum of $500,000.00, for an aggregate theoretical recovery of $1,500,000.00. The Springers and State Farm also entered into a consent judgment, by the terms of which State Farm paid $15,000.00 to the Springers pursuant to the specific medical cost coverage, $100,000.00 to Springer and her husband under the uninsured motorist coverage, and $100,000.00 to their daughter under the uninsured motorist coverage. By the terms of the settlement agreement with State Farm, the Springers assigned to State Farm their judgments against Thigpen.

The Plan had no knowledge or notice of the Springers' court actions against Thigpen and State Farm, and no knowledge or notice of the consent judgments obtained against Thigpen and State Farm until after such judgments were reached. All of this litigation took place without the Plan's permission or participation.

When it paid the $200,000.00 to the Springers under the uninsured motorist coverage, State Farm refused expressly to exclude that part of the Springers' claims which sought recovery of medical expenses, although, as noted, $15,000.00 was contemporaneously paid expressly under the separate medical coverage. In other words, there was nothing contained in the consent judgments based on the uninsured motorist coverage to categorize or to break down the $200,000.00 into its various theoretically possible components.

The Springers' total medical cost that resulted from their injuries is $35,181.79, all of which was usual, reasonable, customary, and necessary. Springer submitted a claim or claims to the Plan for this $35,181.79, whereupon the Plan's administrator sent to Springer a proposed "reimbursement agreement" and an "accident fact sheet," clearly indicating that the Plan was aware of a potential or pending tort claim by the Springers against a third party or parties. These items were accompanied by a demand that the forms be filled out, signed and returned. Springer neither executed nor returned this so-called "reimbursement agreement." She did, however, offer to reimburse the Plan to the extent of any assets recovered by the Springers from Thigpen. State Farm, in theory, is entitled to the first $215,000.00 ever collected from Thigpen, and the Springers are entitled to the next $1,285,000.00, all of which they would gladly assign to the Plan, but none of which, of course, will ever become collectible.

If the Springers had executed the so-called "reimbursement agreement" as drafted by the Plan, the Plan would have become fully indemnified by the proceeds collected by the Springers from State Farm, and the Springers would actually be entitled to nothing from the Plan. The execution of the "reimbursement agreement" would undoubtedly have caused more trouble to the Springers than it was worth. For instance, if the Springers had assigned to the Plan their entire cause of action against Thigpen as the "reimbursement agreement" called for, they would have violated State Farm's subrogation rights, and State Farm in all likelihood would have been delighted to find itself presented, on a silver platter, with a defense to its uninsured motorist coverage. The Plan was offering Springer a Hobson's choice. It is very easy to understand why she chose not to jeopardize a viable and virtually sure claim for $215,000.00 in order to "protect" a questionable claim for $35,181.79.

The Plan has never formally denied Springer's claim. Instead, it consistently took the position that it has no obligation to process her claim unless and until the "reimbursement agreement" is executed and submitted along with the claim.

Springer has not exercised any purported right of appeal from a claim denial or from an alleged adverse decision by the Plan. The Plan wants the court to interpret the parties stipulation-of-fact as containing a concession by Springer that the monies which she, her husband and daughter recovered under their uninsured motorist coverage included the entire medical expense balance of $20,181.79 not recovered under the specific $15,000.00 medical benefits coverage, so that if the Plan should be called upon to pay anything in this case, the pay-

ment would constitute a double recovery. This is not the interpretation which this court places on the stipulation-of-fact, and it was not the interpretation which the jury obviously placed on the stipulation. The jury's interpretation of the entire factual scenario is reflected in the jury's response to interrogatories numbers 10 and 11, as follows:

10. Did Ethelene Springer recover for any of the medical expenses at issue from her automobile insurance coverage?

YES  x    NO ___

11. ONLY if the jury answered Interrogatory number ten "YES," state the amount of medical expenses recovered for Ethelene Springer's, her husband's, and her daughter's medical expenses from the automobile insurance company?

$15,000.00

■ The court agrees with the jury that the Springers only received from State Farm a recovery for *medical* expenses of $15,000.00. This means, of course, that the other two judgments against State Farm, aggregating $200,000.00, represented damages *other than* medical reimbursement, such as psychological injury, lost wages, punitive damages, etc. Even if State Farm had expressly agreed to purport to exclude "medical benefits" from the two $100,-000.00 judgments, such an agreement would not have been effectual as far as the Plan is concerned, because the Plan was not a party to the consent judgments. The advisory jury had a sound evidentiary basis for concluding that $20,181.79 (the difference between $15,000.00 and $35,181.79) in medical expenses has not yet been recovered by the Springers from any third-party source and is, therefore, owed by the Plan. The court disagrees with the jury's response to interrogatory number 12 by which the jury would seem to have indicated a belief that if the Plan is now required to pay to the Springers the same $15,000.00 in medical benefits they recovered from State Farm, it would *not* constitute a "double recovery" of this $15,000.00. The court believes that the jury misunderstood the question, probably because the question was not clearly put by the court.

It is impossible, without any express findings of fact by the state court in which the judgments against State Farm were entered, to know exactly how the $200,000.00 should be broken down. Such a procedure or series of findings would have been highly unusual under Alabama practice. The ultimate conclusion reached by the advisory jury, namely, that the Springers recovered only $15,000.00 from State Farm for their medical expenses, makes good sense.

■ There were other questions of disputed fact put to the jury for its advice. The court agrees with the jury's finding that plaintiff Springer received a copy of the Plan booklet which purported to require a participant to sign a subrogation agreement as a condition precedent to any payment of benefits. The court disagrees with the jury's findings (1) that Springer breached the Plan agreement by failing to seek an administrative review prior to filing this action; (2) that Springer's failure to execute the "reimbursement agreement" constituted a material breach by Springer of the Plan document; and (3) that the Plan's insistence that Springer sign this particular "reimbursement agreement" did not constitute an abuse of the Plan administrator's discretion. To the contrary, the court finds that the proffered "reimbursement agreement" was, to say the least, ambiguous and confusing, and to have signed it would have given the Plan more than it was entitled to under the Plan document and would probably have caused serious litigation problems for the Springers.

As stated, the Plan has taken the position, from which it has never deviated, that it has never *denied* Springer's claim. This position is consistent with the absence of evidence of a written explanation for a denial, as would be required by ERISA, and as was an admitted requirement contained in the following provision of the Summary Description:

If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reasons for the denial.

The Summary Description also contained the following language:

> If you have a claim for benefits which is denied or *ignored in whole or in part,* you may file suit in a state or Federal court.

(emphasis supplied).

The Summary Description itself did not alert a participant to any requirement that subrogation rights against third persons be assigned to the Plan as a prerequisite to consideration of a claim for medical benefits, but the Plan document itself, a copy of which was available to Springer in the employee lounge at her Wal–Mart store, contained the following provisions on this subject:

*Coordination of Benefits*

Coordination of Benefits shall apply to this PLAN and mean the working together of two or more separate health benefit plans to pay up to 100% of the eligible expenses incurred by a PARTICIPANT in the PLAN. This Coordination of Benefits provisions will apply to the following types of other plans:

> 1) Group, blanket or franchise insurance coverage; or
> 2) Group hospital or medical service plans and other group prepayment coverage; or
> 3) Any coverage under labor-management trusteed plans, union welfare plans, employer organization plans, or employee benefit organization plans; or
> 4) Any coverage under government plans, such as MEDICARE; or
> 5) Automobile insurance (no-fault) coverage where the coverage is group-rated; or
> 6) Any private or association plan which is group-rated.

For the purpose of establishing the order of benefit determination, the following rules will apply:

> a) The plan without coordinating provisions is always primary.
> b) The plan covering the PARTICIPANT for whom the claim is made, other than as the DEPENDENT, pays first, and the other plan pays second.
> c) The benefits of a plan covering the DEPENDENT of a male ASSOCIATE will be determined before the benefits of a plan which covers the DEPENDENT of a female ASSOCIATE. (In the case of a step-child, the natural father is primary, if he has coverage, next the step-father, next the mother).
> d) When none of the above establish an order of benefit determination, then the plan which has covered the PARTICIPANT for whom the claim is made for the longest period of time will pay first.

Whenever payments which should have been made under this PLAN in accordance with these provisions have been made under any other plans, the PLAN shall have the right, exercisable alone and in its sole discretion, to pay over to any organizations making such other payments any amounts it shall determine to be warranted in order to satisfy the intent of these provisions and amounts so paid shall be deemed to be benefits paid under this PLAN.

In addition to the other rights provided in this PLAN document, the PLAN shall have the right to reduce benefits otherwise properly payable to the PLAN to the extent of any and all of the following:

> 1. Judgments, settlements, or other payment or payments made by any person or persons considered responsible for the condition giving rise to the medical expense or by *their insurer*(s); or
> 2. Automobile insurance *medical payments coverage benefits* to which the PARTICIPANT is entitled.

(emphasis supplied).

\*　　\*　　\*　　\*　　\*　　\*

If a PARTICIPANT receives benefits, services, payments or credits for a physical condition or injury caused by a third party or for which a third party may be liable, the PLAN reserves the right to recover any amount it has paid for the condition or injury in question. The PARTICIPANT must, at the PLAN'S re-

quest, take any action, give information and assistance, and execute documents required by the PLAN to enforce its right of recovery. If a PARTICIPANT fails to comply, the PLAN may withhold benefits, services, payments or credits due under the PLAN document. The PARTICIPANT or anyone in his or her behalf may not do anything after the PARTICIPANT accepts benefits for such condition or injury in question that might prejudice the recovery rights of the PLAN. If the PARTICIPANT prejudices the recovery rights of the PLAN, the PLAN may make the recovery from the PARTICIPANT or from the ASSOCIATE of whom he or she is a DEPENDENT as provided in the preceding paragraph on Right to Recovery or otherwise.

All benefits paid or provided by the PLAN to or on behalf of a PARTICIPANT shall, by agreement of the parties, be considered as advance payments of Workers' Compensation benefits or of benefits from the Social Security Administration, Veterans Administration, State and Local Social Services Agencies, etc. In the event the PARTICIPANT is later awarded or paid Workers' Compensation benefits of any kind or description under nay applicable law or is awarded or paid benefits from the Social Security Administration, Veterans Administration, State and Local Social Services Agencies, etc., then the PLAN shall have the right to be, and shall be, reimbursed the amount of all benefits paid or provided by the PLAN to or on behalf of the PARTICIPANT.

Neither the Summary Description nor the Plan document provided for the execution of a so-called "reimbursement agreement" or an assignment of subrogation rights as a precondition to payment of medical benefits. Rather, the Plan document seems by its own terms to provide whatever rights the Plan has in this regard, although there is some bothersome inconsistency between the provisions entitled "Coordination of Benefits" and the provisions entitled "Right to Reimbursement."

The Plan document also provided a claim appeal procedure which the court concludes not to be pertinent in this case.

The so-called "reimbursement agreement," which was sent to Springer and which she refused to sign, contained the following inconsistent and ambiguous language, which, as previously discussed, understandably perplexed Springer. It also perplexed her lawyer, who advised her not to sign it. It read:

IN CONSIDERATION of the sum of benefits paid or to be paid by the Wal-Mart Stores, Inc. Health and Welfare Trust pursuant to the Wal-Mart Associates' Group Health Plan (hereinafter referred to as the "TRUST"), _____ _____, Associate, and ____-_____, injured dependent(s), if any, of Associate, (hereinafter collectively referred to as "BENEFICIARY"), agree(s) as follows:

1. That *the TRUST has a right to be reimbursed to the extent of the benefits paid or to be paid on behalf of BENEFICIARY by reason of injuries and damages sustained by BENEFICIARY as a result of an occurrence* on or about _____, 198__, at or near the City of _____, _____, which occurrence is believed to have been caused by _____ _____.

2. That the TRUST, its successors and assigns, *is authorized to collect, compromise, or sue in BENEFICIARY'S name(s) for the amount of benefits paid or to be paid by it.*

3. That in the event that BENEFICIARY should file or has filed suit or claim against any person, firm or corporation for the injuries and damages sustained as a result of the occurrence on or about the above-referenced date, *the TRUST, its successors and assigns, shall have such interest in the suit or claim as to sufficiently reimburse the TRUST for the amount of benefits paid or to be paid by it.*

4. That BENEFICIARY warrants that no settlement has yet been made with any person, form, or corporation for

the injuries and damages sustained as a result of the occurrence and that *the TRUST shall share in any such settlement to the extent of the amount of benefits paid or to be paid by it.* (emphasis supplied).

## Conclusions of Law

This court has jurisdiction over the subject matter under 29 U.S.C. § 1132. Personal jurisdiction is conceded.

The Plan's "non-exhaustion" defense is so flimsy as to be nonsensical. It is obvious that the Plan administrator would not process Springer's claim unless and until Springer executed the so-called "reimbursement agreement." There is some disagreement among federal courts over whether ERISA's guarantee of access to federal courts can be postponed or frustrated by an insistence upon the prior exhaustion of burdensome, internal appeal procedures and/or forced arbitration, particularly when the internal appellate reviewer is basically the same entity as the initial internal decider and when both deciders have an interest in "holding costs down," something the Plan admits to be a major consideration in this case. *See Bartz v. Carter,* 709 F.Supp. 827 (N.D.Ill.1989).

■ Assuming *arguendo* that an ERISA-controlled medical benefits plan can contractually require an exhaustion of some reasonable administrative review process as a precondition to court action, the insistence on "non-exhaustion" as a defense in this case is academic for at least three reasons. First, the Plan insists that it never *denied* Springer's claim but rather only refused to process the claim because of Springer's refusal to execute the so-called "reimbursement agreement." According to the Plan's own appellate process, Springer could only appeal from a *written* denial, and there was certainly no written denial. Second, both the Plan Summary and ERISA's language give Springer the right to "file suit in a state or Federal court" in the event she has a "claim for benefits which is ... *ignored in whole or in part....*" (emphasis supplied). Her claim was ignored at least in part. Third,

to have attempted to exhaust administrative remedies under these circumstances would have been futile and would have exhausted Springer more than her remedy. *See Carter v. Signode Indus., Inc.,* 688 F.Supp. 1283 (N.D.Ill.1988).

■ Contrary to the advisory jury's response to one of the special interrogatories, the Plan itself violated the terms of the Plan document when it insisted that Springer execute the so-called "reimbursement agreement" in the form in which it was submitted. The Coordination of Benefits provision of the Plan document only allowed the Plan to reduce the medical benefits it owed, insofar as here relevant, by the amounts of "automobile insurance medical benefits coverage" (here $15,-000.00), and of "judgments, settlements, or other payment or payments made by any person or persons considered responsible for the condition giving rise to the medical expense or by their insurer(s)." (here *zero* ). Thigpen, the tortfeasor clearly guilty of wanton misconduct, has made no payment to the Springers and never will. State Farm, which has made a payment of $200,000.00 to the Springers on a *tort* claim, *was not Thigpen's insurer.* It rather was the *Springers' insurer.* The Plan document language, obviously drafted by the Plan, and not by Springer, must be construed against the Plan. Unfortunately for the Plan, its language does not call for the reimbursement of medical benefits obtained by a participant from an insurance company covering the participant for injuries inflicted by an uninsured motorist.

The Plan could not have been prejudiced by the Springers' settlement with State Farm, inasmuch as the Plan had no right to reimbursement from State Farm, except as to the particularized medical benefits coverage. There was no prejudice to the Plan by the Springers' assignment to State Farm of their judgment against Thigpen to the extent of State Farm's outlay, because the judgment against Thigpen is worthless. The Springers have tendered to the Plan the balance of their judgment against Thigpen to the extent not recovered by State Farm to reimburse itself. If the Plan

wants such an assignment and so notifies the court within ten (10) days, the court will order such an assignment, and the Plan will have a nice piece of paper to put in a file somewhere.

■ To recapitulate, the proposed "reimbursement agreement" contains provisions that go well beyond anything the Plan document can justify. First, the proposed agreement purportedly would call for the signature of Springer's husband, something not expressly contemplated by the Plan document. Second, Springer would purportedly bind her minor daughter, something Springer could not do without an expensive and time-consuming state probate court proceeding. Third, if Springer signed the agreement she would have purported to authorize the Plan to sue Thigpen and/or State Farm in Springer's name, a procedure which could, and probably would, have constituted strategic and procedural disaster for all concerned. Fourth and last, the proposed agreement was not limited to the subrogation against Thigpen or *his* insurer provided by the Plan document. Thus, the demanded assignment language went beyond what the Plan document called for.

Under these circumstances, Springer not only was justified in refusing to execute the so-called "reimbursement agreement," but had the right to sue the Plan in federal court when she did.

It is somewhat ironic that the Plan now wants the court to be led by some of the advisory jury's contradictory findings, where arguably favorable to the Plan, even though the Plan vigorously opposed the empaneling of the jury which plaintiff just as devoutly wanted.

The court cannot conclude this opinion without expressing its agreement with the recent Seventh Circuit decision cited by neither party, namely, *Winstead v. Indiana Ins. Co.*, 855 F.2d 430 (7th Cir.1988). In *Winstead,* the Seventh Circuit successfully wrestled for a way to reconcile an ERISA-governed insurance policy with a non-ERISA governed policy, each of which had an incompatible "other insurance" or "coordination of benefits" clause. The Seventh

Circuit there congratulated the district court on its "solomonic apportionment of liability." 855 F.2d at 434. This court disclaims any intent to compare itself with Solomon and finds the *Winstead* solution inappropriate in Springer's case. The Seventh Circuit also spoke of the ERISA defendant's perennial defense of *preemption* and, with relief, there said: "Fortunately, we need not parse the confusing and, at times, self-contradictory clauses of ERISA...." *Id.* (footnote omitted). Another very recent decision also involving "coordination of benefits" in an ERISA context, and also not cited by either party here, is *Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676 (5th Cir.1989). In that case, the Fifth Circuit affirmed summary judgment in favor of a health plan that rejected a claim for medical expenses after Pan American Airlines and its liability insurers had paid the same medical expenses proximately resulting from a Pan Am plane crashing into the Schultz's residence. *Schultz* is readily distinguishable from *Springer.* Pan Am and its *insurers* settled with the Schultz family for $7.2 million expressly *in addition to all of their medical expenses.* In other words, in *Schultz* there was no ambiguity or confusion over the application of the contract language there designed to preclude a double recovery of medical expenses by the plan participant.

### Conclusion

The only question remaining is what amount of money the Plan owes Springer. The court has already disagreed with the Plan's predictable argument that the burden was on Springer to prove that the Plan's administrators abused their discretion when they chose not to pay, or even to consider, the claim without Springer's signing the so-called "reimbursement agreement." The burden of proof here was the same as the burden of proof on any plaintiff who sues on a contract. *See Schultz,* 872 F.2d at 676, and *Bruch,* —— U.S. —— at ——, 109 S.Ct. at 948. However, the result in this particular case would have been the same as to the Plan's refusal to

process the claim unless the overreaching "reimbursement agreement" was executed, even if Springer had had the higher burden of proving an abuse of discretion by the Plan. *See McKinnon v. Blue Cross–Blue Shield of Alabama,* 691 F.Supp. 1314 (N.D. Ala.1988), *aff'd,* 874 F.2d 820 (11th Cir. 1989).

Springer received $15,000.00 in medical reimbursement from State Farm and no more. She cannot recover this $15,000.00 twice. The unequivocal language of the Plan document precludes her claim against the Plan to the extent of this $15,000.00. However, Springer still has a valid, unpaid claim against the Plan in the sum of $20,-181.79. That sum theoretically has accrued legal interest from the later of the date upon which Springer's claim was filed with the Plan or the date she received the $15,-000.00 from State Farm, but Springer has failed to prove the date upon which her claim accrued, so no interest can be awarded.

A separate, appropriate judgment will be entered.