John D. PETERMAN and Kathy J. Peterman, Plaintiffs-Appellants,

v.

MIDWESTERN NATIONAL INSURANCE COMPANY, a Wisconsin corporation, Special Products, Inc., a Wisconsin corporation, and Frank A. Busalacchi, Defendants,

VISUALS PLUS, INC., a Wisconsin corporation, Defendant-Respondent. [Case No. 91–2717.]

John D. PETERMAN and Kathy J. Peterman, Plaintiffs-Appellants,

v.

MIDWESTERN NATIONAL INSURANCE COMPANY, Defendant-Cross Appellant,

VISUALS PLUS, INC., a Wisconsin corporation, Defendant,

SPECIAL PRODUCTS, INC., a Wisconsin corporation and Frank A. Busalacchi, Defendants-Respondents-Cross Respondents. [Case No. 92–0050.]

Court of Appeals

*Nos. 91–2717, 92–0050. Oral argument January 27, 1993.—Decided June 15, 1993.*

(Also reported in 503 N.W.2d 312.)

683

684

685

For the plaintiffs-appellants the cause was submitted on the brief of *Charles D. Clausen, Caren B. Goldberg* and *Ted A. Warpinski* of *Friebert, Finerty & St. John, S.C.* of Milwaukee. There was oral argument by *Caren B. Goldberg* and *Ted A. Warpinski*.

For the defendant-respondent the cause was submitted on the brief of *R. Scott Ritter* of *Hogan, Ritter, Minix & Comeau* of Milwaukee. There was oral argument by *R. Scott Ritter*.

For the defendant-cross appellant the cause was submitted on the brief of *James P. Brennan* of *Brennan & Collins* of Milwaukee. There was oral argument by *James P. Brennan*.

For the defendants-respondents-cross respondents the cause was submitted on the briefs of *Terence B. Kelly* of *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee. There was oral argument by *Terence B. Kelly*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

WEDEMEYER, P.J. John D. Peterman and Kathy J. Peterman (the Petermans) appeal from a judgment dismissing their complaint against Special Products, Inc. (Special Products), and Frank A.

Busalacchi (Busalacchi). The Petermans also appeal from a judgment dismissing their complaint against Visuals Plus, Inc. (Visuals).

Midwestern National Insurance Company (MNIC) cross-appeals from a judgment dismissing its cross-claim against Special Products and Busalacchi for indemnification. This is a consolidated appeal.

The Petermans assert the following: (1) the trial court erred in ordering summary judgment in favor of Special Products, Busalacchi and Visuals on the Petermans' state common law claims; and (2) the trial court erred in dismissing the Petermans' amended complaint against Visuals for failing to state a claim upon which relief can be granted. In the cross-appeal, MNIC argues that the trial court erred in granting summary judgment in favor of Special Products and Busalacchi on the issue of indemnification.

Because the Petermans' common law causes of action alleged in the complaint are pre-empted by the Employment Relief Income Security Act, we affirm that part of the judgment dismissing the state common law claims. Because the amended complaint states a cause of action upon which relief can be granted, however, we reverse that part of the judgment. In regard to MNIC's cross-appeal, because there are no genuine issues of material fact, and because Special Products and Busalacchi are entitled to a judgment as a matter of law, we affirm.

## I. BACKGROUND

The Petermans, a married couple, commenced working for Visuals in 1983. As part of John's employment, Visuals provided a health insurance policy through a group plan that extended coverage to both

Kathy and himself.[1] Visuals did not provide Kathy separate insurance coverage because she was considered a dependent under the family coverage of John's policy. In December 1987, Visuals informed John that, commencing January 1, 1988, Visuals would pay the entire premium for his family plan health insurance coverage. Visuals also decided, effective January 1, 1988, to change its insurance carrier to MNIC after receiving an attractive proposal from its insurance agent, Busalacchi, the owner of Special Products.

Sometime in December, Visuals held a meeting with its employees to explain the change in carriers and to discuss how the change would be accomplished. Visuals informed its employees that it did not intend to change the nature of the coverage previously provided. Visuals' management instructed the employees to fill out forms to achieve the change. John and Kathy attended the meeting and filled out the required forms. The Petermans subsequently learned that they would be provided with individual policies rather than a family plan having dependent coverage. The rationale was cost effectiveness. Kathy inquired of a Visuals' insurance administrator about the consequences of pregnancy. Kathy was told that if she became pregnant she could simply change to a family plan at no additional cost.[2]

On or about February 14, 1989, Kathy informed the insurance administrator of Visuals that she was

---

[1] The cost of the insurance coverage was split evenly between Visuals and John.

[2] The certificate of insurance subsequently issued to the Petermans contained no provision as to when and how to achieve dependent coverage; nor did the certificate require that a written request be made to MNIC prior to the birth of the child to effectuate coverage.

pregnant and that her baby was due July 25, 1989. Kathy and the administrator discussed the necessity of changing her insurance coverage to a family plan. The administrator told Kathy that she would contact MNIC to determine the appropriate procedures to effectuate a change to family coverage.

The administrator first contacted Special Products. Special Products did not know how to proceed, but indicated that it would contact MNIC. MNIC informed Special Products that Kathy should change to the family coverage plan one month prior to delivery or, in this case, by June 1, 1989. Special Products informed Visuals who, in turn, relayed the information to Kathy. Visuals, however, did not instruct Kathy on the procedure to be followed to effectuate family coverage nor did it advise her of the consequences of failure to change coverage before the birth of the baby.

The Petermans' baby was born April 10, 1989, three months premature. Following the birth of the baby, the administrator of Visuals instructed the Petermans to fill out the forms necessary to substitute individual coverage for family coverage. MNIC received the forms April 20, 1989. MNIC, however, denied all claims relating to the baby on the basis that no coverage existed when she was born.

Subsequently, the Petermans filed a complaint against MNIC, Special Products, Busalacchi and Visuals alleging: (1) a compensatory damages claim against MNIC under sec. 631.09(2), Stats.,[3] as well as a puni-

---

[3] Section 631.09(2), Stats., reads as follows:

(2) ACTS OF AGENT. A failure by any policyholder or insured to perform an act required to perfect his or her rights under the policy, or failure to perform the act in the time and manner prescribed, does not affect the insurer's obligations under the policy if the failure was caused by an act, statement or representation

tive damages claim against MNIC for unreasonable delay in disbursing benefits; (2) a compensatory damages claim against Busalacchi and Special Products for negligence; and (3) a compensatory damages claim against Visuals for negligence and breach of contract.

The Petermans moved for summary judgment against all the defendants and Visuals filed a cross-motion for summary judgment. The trial court denied the Petermans' motion against MNIC. The trial court concluded that although the claim against MNIC under sec. 631.09, Stats., was exempt from the operations of ERISA's preemptive provisions, there nevertheless existed a factual issue of causation as between the Petermans and MNIC. Second, the trial court granted summary judgment dismissing the Petermans' negligence and breach of contract claims against Visuals. The trial court reasoned that the claims related to an employee benefit plan and, therefore, were preempted by ERISA. Third, the trial court granted summary judgment dismissing the Petermans' claims against Special Products and Busalacchi because they too were not available under ERISA. Last, the trial court granted summary judgment dismissing the Petermans' bad faith claim against MNIC, as well as MNIC's cross-claim for indemnification against Special Products and Busalacchi.

The Petermans subsequently amended their complaint and added a claim against Visuals for benefits under ERISA seeking to estop a denial of family dependent coverage benefits by Visuals and MNIC. Visuals moved to dismiss the amended complaint for failure to state a claim upon which relief could be granted. The

or omission to perform a duty by an agent of the insurer who has apparent authority, whether or not the agent was within the actual scope of the agent's authority.

trial court granted the motion on the pleadings, concluding that estoppel principles were not properly applicable and, therefore, the Petermans had failed to state a claim upon which relief could be granted.

## II. COMMON LAW CLAIMS

The Petermans first claim that the trial court erred in ordering summary judgment on their claims of negligence and breach of contract against Visuals and their claims for a breach of duty of good faith against Busalacchi and Special Products.

*A. Standard of Review*

Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Section 802.08(2), Stats. On review, appellate courts apply the summary judgment standards in the same fashion as trial courts. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). In summary judgment cases we review the matter *de novo*. *United States Fidelity & Guaranty Co. v. Goldblatt Bros., Inc.*, 142 Wis. 2d 187, 190, 417 N.W.2d 417, 419 (Ct. App. 1987).

Under sec. 802.08(2), Stats., the moving party must first establish a *prima facie* case for summary judgment. That burden having been met, it then becomes incumbent upon the non-moving party to submit facts to raise a genuine issue of material fact so as to prevent summary judgment. *Kraemer Bros., Inc. v. United States Fire Ins. Co.*, 89 Wis. 2d 555, 566–67, 278 N.W.2d 857, 862 (1979).

## B. *Discussion*

To better inform the reader of the nature and significance of this dispute, we believe a brief explanation of the content and development of ERISA law is appropriate.

ERISA established a comprehensive system regulating private benefit plans including both pension plans and welfare plans. A "welfare plan" is defined to include, *inter alia*, any plan, fund or program "maintained for the purposes of providing medical or other health benefits for employees or their beneficiaries through the purchase of insurance or otherwise." ERISA § 3(1), 29 U.S.C. § 1002(1) (1988). Subject to certain exemptions, ERISA applies generally to all employee benefit plans sponsored by an employer or an employee organization. ERISA § 4(a), 29 U.S.C. § 1003(a) (1988).

As noted recently by the Supreme Court, ERISA has preemptive effect over state law:

> ERISA's pre-emption provision assures that federal regulation of covered plans will be exclusive. Section 514(a) provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA § 514(a), 29 USC § 1144(a). Several categories of state laws, such as generally applicable criminal laws and laws regulating insurance, banking, or securities, are exempted from ERISA preemption by § 514(b), 29 USC § 1144(b).

*District of Columbia v. The Greater Washington Bd. of Trade*, 113 S. Ct. 580, 581 (1992).[4] Further, the act

---

[4] ERISA § 514(a), 29 U.S.C. § 1144(a) (1988) (emphasis added), provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter *relate to* any

defines "state laws" to include "all laws, decisions, rules, regulations, or other state action having the effect of law, of any state." ERISA § 514(c), 29 U.S.C. § 1144(c)(1) (1988).

Although one express purpose of ERISA was to protect the rights and benefits of participants and their beneficiaries in privately funded benefit plans, the application of the pre-emption provision by some courts has cast doubt as to whether this purpose of the act is being fulfilled. To the contrary, many *delicts* which have occurred as the result of the operation of covered plans have gone without remedy because of the iron-cast interpretation given the pre-emption provision.

Cognizant of this unintended result, many courts, with scholarly support,[5] have intermittently suggested

---

employee benefit plan." The Supreme Court has stated that a law "relates to" a plan for the purposes of § 514(a) "if it has a connection with or reference to such a plan." *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987). ERISA preempts any state law that refers to or has a connection with a benefit plan and is not precluded in the exemptions. Thus the words "relate to" are deliberately expansive. *Id.* at 46–47.

[5] *See, e.g.,* Fischel & Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule,* 55 U. CHI. L. REV. 1109 (1988); Irish & Cohen, *ERISA Preemption: Judicial Flexibility and Statutory Rigidity,* 19 U. MICH. J.L. REF. 109 (1988).

Some in Congress have also supported the concept of developing a federal common law for ERISA:

> The Committee believes that the legislative history of ERISA and subsequent expansions of ERISA support the view that Congress intended for the courts to develop a Federal common law with respect to employee benefit plans, including the development of appropriate remedies, even if they are not specifically enumerated in section 502 of ERISA. Since the issue of preemption and civil remedies under ERISA is within the exclusive purview of the labor committees of Congress, the Committee has, over the years, considered the option of amending the statute to encompass specifically

that the proper approach to allay these perceived inequities is the development of a body of federal common law that amplifies the statute and fills in gaps currently existing in its provisions. *See Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir. 1989); *Landro v. Glendenning MotorWays, Inc.*, 625 F.2d 1344, 1351 (8th Cir. 1980); *Springer v. Wal-Mart Associates' Group Health Plan*, 714 F.Supp. 1168, 1169–70 (N.D. Ala. 1989).[6]

> several additional remedies. In light of the legislative history on this issue, however, the Committee believes such action is unnecessary. The Committee reaffirms the authority of the Federal courts to shape legal and equitable remedies to fit the facts and circumstances of the cases before them, even though those remedies may not be specifically mentioned in ERISA itself. In cases in which, for instance, facts and circumstances show that the processing of legitimate benefit claims has been unreasonably delayed or totally disregarded by an insurer, an employer, a plan administrator, or a plan, the Committee intends the Federal courts to develop a Federal common law of remedies, including (but certainly not limited to) the imposition of punitive damages on the person responsible for the failure to pay claims in a timely manner.

H.R. REP. No. 801, 100th Cong., 2nd Sess. pt. 2 at 63 (1988).

In contrast, however, is *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–48 (1985), where the Supreme Court declared that ERISA's civil enforcement scheme was comprehensive in its existing form and provided strong support for the conclusion that Congress intended no other available remedies.

In a concurring opinion, Justice Brennan attempted to qualify the effect of the majority opinion's expansive language by explaining that nothing in the majority opinion should be interpreted as precluding the development of federal common law. *Id.* at 156–58 (Brennan, J., concurring).

[6] The frustration experienced by lower courts concerning the preemption issue is evident in *Springer*, 714 F.Supp. at 1170, where District Judge Acker expressed the following view:

> Nonetheless, this court would welcome a Congressional or a Supreme Court reconciliation on the important, confusing and

Notwithstanding scholarly suggestions, judicial dicta, and congressional concern[7] regarding the Supreme Court's expansive approach on preemption, the declaration in *Pilot Life* that, "[u]nless . . . common law causes of action fall under an exception to § 514(a) . . . they are expressly pre-empted," remains the prevailing measure for application of the preemption provision. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48 (1987). The Court appears committed to the proposition that traditional state common law causes of action, unless included in the six civil enforcement provisions found in ERISA § 502(a),[8] are excluded.

depressing subject of preemption, especially in view of the fact that the Sixth Circuit . . . went in what this court believes is a desirable different direction in *Perry v. P\*I\*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir. 1989) . . . that preemption should apply to state law claims only if Congress has provided in ERISA a remedy for any historically legally recognized wrongs asserted. Further, Congress itself, speaking through the House Education and Labor Committee, has overtly quarreled with the prevailing reading of *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed. 2d 39 (1987).

[7] As noted in H.R. REP. No. 801, 100th Congress., 2nd Session., Pt. 2, at 63 (1988):

In *Pilot Life*, the Supreme Court held that state common law claims against an insurance company for breach of contract and bad faith arising out of an improper denial of disability benefit claims under an ERISA-covered plan were preempted. In addition, the Supreme Court declined to fashion a federal common law remedy for improper processing of benefit claims, holding that ERISA's civil enforcement provisions under sec. 502 were intended to be the exclusive remedies afforded to plan participants and beneficiaries. The committee disagrees with this latter conclusion.

[8] Section 502(a) states that a civil action may be brought:

(1) by a participant or beneficiary—
    (A) for the relief provided for in subsection (c) of this section, or

■

In the present case, when the trial court addressed the pre-emption question raised on summary judgment motion, it also recognized the varying applications of ERISA's preemption mandate. The court, nevertheless, felt bound by the language of *Pilot Life* and the expansive effect given to the "relates to" language. Consequently, it dismissed all the claims averred by the Petermans with the exception of their sec. 631.09, Stats., claim. We similarly, although reluctantly, feel compelled to observe the *Pilot Life* stricture. We have reviewed the record carefully and conclude that the Petermans have presented no material issue of fact as to why their common law causes of action should be

---

(B)  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2)  by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3)  by a participant, beneficiary, or fiduciary—
(A)  to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
(B)  to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4)  by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 105(c) [29 U.S.C. § 1025(c)] of this title;

(5)  except as otherwise provided in subsection (b) of this section, by the Secretary
(A)  to enjoin any act or practice which violates any provision of this subchapter, or
(B)  to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; or

(6)  by the Secretary to collect any civil penalty under subsection (c)(2) or (i) or (1) of this section.

29 U.S.C. § 1132(a) (1988).

excepted from the preemption language of ERISA. Therefore, Special Products, Busalacchi and Visuals are entitled to a judgment as a matter of law concerning all of the Petermans' common law claims.

## III. FAILURE TO STATE A CLAIM

The Petermans next claim the trial court erred in concluding that their amended complaint did not state a claim against Visuals upon which relief can be granted. This claim of error presents a question of law which this court reviews *de novo. Weber v. City of Cedarburg*, 129 Wis. 2d 57, 64, 384 N.W.2d 333, 338 (1986).

### A. Standard of Review

The purpose of a motion to dismiss a complaint "for failure to state a claim is to test the legal sufficiency of the complaint." *Evans v. Cameron*, 121 Wis. 2d 421, 426, 360 N.W.2d 25, 28 (1985). In making the dismissal determination, the facts pled are taken as admitted. *Id.* Pleadings are to be liberally construed with a view to substantial justice to the parties. Section 802.02(6), Stats.; *Prah v. Maretti*, 108 Wis. 2d 223, 229, 321 N.W.2d 182, 186 (1982). We will affirm an order dismissing a complaint for failure to state a claim only if, upon a review of the allegations contained therein, it appears to a certainty that no relief can be granted under any set of facts which the plaintiffs could prove in support of them. *Quesenberry v. Milwaukee County*, 106 Wis. 2d 685, 690, 317 N.W.2d 468, 471 (1982).

## B. Discussion

In granting the motion to dismiss, the trial court relied principally on two cases: *Pilot Life* and *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir. 1990) — each case for a different reason.

The trial court read *Pilot Life* to mean that under the allegations asserted, the Petermans' claim was preempted by ERISA or, otherwise stated, not maintainable.

*Black*, in essence, approved the application of estoppel to bar the denial of benefits under an unfunded single employer welfare benefit plan. When applying *Black* to the Petermans' assertion of estoppel to bar the denial of family coverage, the trial court distinguished *Black* on its facts in that *Black* involved a specific existing severance pay provision that was ignored by the employer. By contrast, the trial court reasoned that the Petermans' claim did not involve such a scenario. Thus, under the facts alleged by the Petermans, the trial court concluded the applicability of estoppel was not warranted.

We do not quarrel with the trial court's view that *Pilot Life* and *Black* are dispositive of this appeal. We do disagree, however, with the trial court's analysis of *Black* and, therefore, reach a different conclusion.

The precise question we must address in this case is whether ERISA, under its federal common law, recognizes claims supported by the doctrine of estoppel.

Estoppel in its broadest sense is a doctrine "grounded in basic principles of justice and where applicable, can bar a party from asserting legal or equitable rights." *Kellogg v. Village of Viola*, 67 Wis. 2d 345, 350, 227 N.W.2d 55, 58 (1975). In Wisconsin, the doc-

698

trine of estoppel has been invoked in situations where the action or nonaction of one party induces another party's reliance thereon, either in the form of action or nonaction, to the latter party's detriment. *M & I Bank v. First American National Bank*, 75 Wis. 2d 168, 176, 248 N.W.2d 475, 480 (1977). In *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59 (1984), the Supreme Court adopted the RESTATEMENT (SECOND) OF TORTS view concerning estoppel:

> If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act . . . the first person is not entitled
>
> . . . .
>
> (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired. Restatement (Second) of Torts § 894(1) (1979).

Of all the ERISA cases examining the application of the doctrine of estoppel to welfare plan controversies, *Black* has probably analyzed the implications more thoroughly than any other. In *Black*, the court initially noted "that estoppel principles generally apply to all legal actions. It is an exception to that general rule to deny the use of the doctrine." *Black*, 900 F.2d at 115. In the area of ERISA cases, however, the court recognized the lack of unanimity in applying estoppel principles. *Id.* Even among those courts recognizing its application, there exists resistance to the doctrine because of a concern that its application could jeopard-

ize the actuarial soundness of the ERISA plan in question. *Id.*

In *Black*, the court noted the distinction between "two types of ERISA plans: pension plans, which are funded and have strict vesting and accrual requirements; and welfare plans . . . which have no such requirements." *Id.* In the case of an unfunded welfare plan, the court noted that "there is no particular fund which is to be depleted by paying benefits." *Id.* "Thus, there is no need for concern about the Plan's actuarial soundness." *Id.* The court in *Black* further observed a general reluctance to apply estoppel to pension plans that were multi-employer in nature, the rationale being that to allow any one employer or fiduciary to bind the fund to pay benefits outside of the strict terms of the plan could make all employers liable for one employer's misrepresentation. *Id.* Obviously, such payments would damage the actuarial soundness of the plan, as well as unfairly put at risk all employees participating in the fund. *Id.*[9]

In *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991), the sixth circuit court referred to the *Black* analysis and further delineated a rationale for applying estoppel when a welfare plan providing insurance benefits was at issue. The *Armistead* court opined that:

---

[9] A similar type of analysis was utilized in *P.I.A. Michigan City, Inc. v. National Porges Radiator Corp.*, 789 F.Supp. 1421, 1424 (N.D. Ill. 1992) (estoppel is appropriate unless applying it would threaten the actuarial soundness of the ERISA plan), and in *Davidian v. Southern California Meat Cutters Union*, 859 F.2d 134, 135–36 (9th Cir. 1988) (oral agreement is without effect if it runs counter to the written instrument). In both cases estoppel was denied because it would have created a substantive change in the coverage under the plan.

The reason is that pension benefits are typically paid out of funds to which both employers and employee contribute. Contributions and pay-outs are determined by actuarial assumptions reflected in the terms of the plan. If the effective terms of the plan may be altered by transactions between officers of the plan and individual plan participants or discrete groups of them, the rights and legitimate expectations of third parties to retirement income may be prejudiced.

This is not necessarily the case with insurance benefit plans. Typically the employer pays policy premiums out of its own assets, perhaps with a contribution from the employee. The actuarial soundness of a fund, which might be depleted if strict vesting and accrual requirements were not observed, is not in issue where a plan of this description is involved. We conclude therefore that in such a case, the purpose of congress in enacting 29 U.S.C. § 1102(a) would not be frustrated by recourse to estoppel principles, which are generally applicable to all legal actions.

*Armistead,* 944 F.2d at 1300.

As indicated earlier, the trial court's unwillingness to accept *Black* as authority was fact driven. We conclude, however, that the basis for the *Black* decision rested not on the distinction drawn by the trial court, but on the absence of any argument that an award threatened the actuarial soundness of the plan involved. Although many of the reported cases attempt to distinguish between "funded" and "unfunded" plans as the rationale to apply or not apply estoppel, we conclude that the crucial element is whether the assets of the welfare plan, however financed, are diverted outside the terms of the plan.

■
Reviewing the cases either accepting or rejecting the application of estoppel, we find none of the circumstances which inhibited the other courts from applying estoppel present in the Petermans' amended complaint. There is no evidence that the application of estoppel will effect the actuarial soundness of the plan in question. Therefore, we conclude that in accord with the purposes of ERISA, estoppel principles may be utilized in this case.

We turn next to the contents of the Petermans' amended complaint to see whether it sets forth sufficient facts concerning the estoppel claim to withstand a motion to dismiss. The amended complaint included all of the allegations of the original complaint (except where contradicted) and added a new allegation under ERISA § 502(a), 29 U.S.C. § 1132(a)(1)B (1988), stating a cause of action for recovery of benefits existing under a welfare plan. The Petermans further requested that estoppel be applied as a bar to the defense that no dependent coverage existed at the time of the birth of their daughter.

In *Pilot Life*, 481 U.S. at 53, Justice O'Connor set forth some of the remedies available to a participant of a plan governed by ERISA:

> Under the civil enforcement provisions of § 502(a), a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits . . . .

In the present case, the Petermans' amended complaint alleges that they are due benefits under the plan and requests that the trial court grant them a declaratory judgment.

The contents of the amended complaint further allege that the Petermans, as employees of Visuals, originally had family dependent plan coverage. They were informed by Visuals that the company's employee benefit plan would be funded by another insurance company. They were also later informed that each of them would receive a separate policy, but it was not intended that the benefits would be reduced from that which they previously had. They knew, however, that no dependency coverage was provided. They were told by Visuals that to obtain dependency coverage, a change in the policy one month prior to the expected birth date of their child would effectuate coverage with no extra cost. Visuals provided the Petermans with no additional information as to the mechanics of such a change or the consequences of failing to make the change prior to the actual birth of the baby.

From the amended complaint it is clear that the Petermans have alleged sufficiently that they relied on the advice given to them by Visuals as provided by MNIC. The Petermans' amended complaint alleges the following: At the time Visuals informed the Petermans that the change should be made by June 1, 1989, there was nothing to indicate that the directions were anything but correct. The Petermans counted on the information as being accurate and had no reason to believe otherwise. The information provided proved to be factually inaccurate. Because of the falsity of the information provided them, they were eventually denied dependency coverage. The falsity of fact worked

703

to their detriment, a result which they neither desired nor sought.

We conclude that the Petermans have made sufficient allegations in their amended complaint to invoke the doctrine of estoppel as a potential bar against Visuals' and MNIC's denial of benefits under the Visuals' employees' welfare plan and consequently have stated a claim for which relief may be granted.[10]

## IV. MNIC CROSS-APPEAL

Following the trial court's ruling that a trial was necessary for the Petermans' sec. 631.09(2), Stats., claim against MNIC, MNIC filed a cross-claim for indemnity against Special Products and Busalacchi. The cross-claim asserted that if MNIC was liable to the Petermans based on the imputed negligence of its agents—Special Products and Busalacchi—MNIC ought to be entitled to indemnity. Special Products and Busalacchi moved for summary judgment seeking a dismissal of the cross-claim.

The trial court concluded that had the Petermans timely applied, MNIC would have issued family coverage. Therefore, Special Products and Busalacchi's

[10] Our conclusion that the Petermans have presented sufficient allegations in their amended complaint to invoke the doctrine of estoppel as a potential bar against Visuals' and MNIC's denial of benefits under the Visuals' employees' welfare plan is arrived at through the process of deductive legal reasoning. Although Justice Blackmun's dissent, as quoted by the concurring opinion, can be read as suggesting that courts should color their legal analysis with "sympathetic reading[s]" in order to reach a specific result, all of us, including the author of the concurring opinion, agree that result-oriented judging is improper.

conduct did not cause any loss to MNIC. The trial court further concluded that because MNIC did not submit any contrary evidence to raise a genuine issue of material fact, summary judgment was appropriate.

*A. Standard of Review*

Earlier in this opinion we stated the proper standard of review to be applied in resolving appeals from summary judgments. We reapply that same standard here.

*B. Discussion*

Both sides agree that under well-recognized principles of agency, an insurance agent who fails to make a full disclosure of all matters concerning the risks of a prospective insured, or neglects to report the issuance of an insurance policy as required by his or her contract of agency, may incur liability for losses sustained by the insurer. *See* Paul G. Reiter, Annotation, *Liability of Insurance Agent, for Exposure of Insurer to Liability, Because of Failure To Fully Disclose or Assess Risk or To Report Issuance of Policy,* 35 A.L.R.3d 821, 823 (1971). However, where the alleged negligence of the agent does not alter the risk accepted by the insurer, or the insurer normally accepts such risks in the normal course of business, the agent's negligence is not the cause of the loss and the agent is not liable therefore. *Id.* at 823–24; *Fidelity & Casualty Co. v. Arcadia Valley Realty & Ins. Agency, Inc.,* 636 S.W.2d 388, 390 (Mo. App. 1982).

Because neither party disputes the appropriate legal standard to be applied, MNIC's cross-appeal distills to whether the above legal proposition applies to

705

the facts in this case. MNIC asserts that the record fails to establish the undisputed fact that MNIC would have issued family coverage if an application had been timely submitted by the Petermans. MNIC further asserts that the trial court erroneously shifted the burden of proof in the summary judgment proceeding, i.e., it required MNIC to establish that a factual dispute existed regarding issuance of a family policy rather than require Special Products and Busalacchi to establish the existence of undisputed fact. We disagree.

It is undisputed that Busalacchi and Special Products were acting as agents of MNIC in their dealings with Visuals Plus. It is also undisputed that they had authority to procure an application for health insurance on behalf of MNIC to bind coverage. The Petermans were participants in this plan, although they had a different type of coverage at all times pertinent. Furthermore, there is no dispute that the Petermans, subsequent to the birth of their child, were approved for family coverage by MNIC. We conclude that Special Products and Busalacchi have made out a *prima facie* case for summary judgment in their favor.

In opposition to the motion for summary judgment, MNIC argued to the trial court that irrespective of the fact that the Petermans were subsequently extended a family coverage policy, the fact remains that the Petermans would have had to undergo an underwriting process before the premature birth, and there is no guarantee that they would have passed this process. This assertion, however, is supported only by conclusory allegations along the lines of "just because we insured you later does not mean we would have insured you earlier." Further, the assertion also ignores the fact that Frank Vierling, Vice President of

706

Life and Health Underwriting at MNIC, wrote a letter to the Petermans wherein he stated: "If the request for a change to family coverage would have been made as the contract states and as our agent advised (prior to delivery) there would have been 'no problem.' " Clearly, this statement recognizes that MNIC was ready, willing and able to insure the Petermans under a family coverage plan prior to delivery if only they had properly requested the change before the baby was born.

We conclude that MNIC has failed to come forward with sufficient facts showing that there is a genuine issue for trial under sec. 802.08(2), Stats. Therefore, we hold that the summary judgment motion was properly granted.

*By the Court.*—Judgments affirmed in part, reversed in part and cause remanded.

SCHUDSON, J. (*concurring*). Wandering through the maze of America's competitive insurance industry, parents often change health care coverage. Sometimes they do so because they become unemployed; sometimes because they change employment; sometimes because they or their employers locate more attractive or affordable insurance programs.

Sometimes, to their amazement, they later learn that their change caused their loss of crucial coverage. Sometimes, based on persuasive promotions from insurance companies and explanations from employers, they could neither anticipate nor reasonably expect that their children would lose coverage too.

Sometimes, as a result, children suffer. That children suffer is tragic at any time, under any circumstances. That children suffer due to loss of

insurance, resulting from adult decisions beyond their control and beyond their parents' control, is tragic and unjust.

Today, this court provides careful legal analysis of one such unjust loss. I add only a few words to assure that, within the maze of legal analysis, we not lose sight of a child — one very little girl who, along with her family, would have suffered had we not found our way to this fundamentally humane and just application of law.

With special pleasure, therefore, I concur and emphasize the message of Justice Blackmun who, in another legal maze, also searched for the health and safety of a child:

> [T]he question presented by this case is an open one, and our . . . precedents may be read more broadly or narrowly depending upon how one chooses to read them. Faced with the choice, I would adopt a "sympathetic" reading, one which comports with dictates of fundamental justice and recognizes that compassion need not be exiled from the province of judging.

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 212–213 (1989) (Blackmun, J., dissenting).